THE BROWN CARRIAGE COMPANY *v.* W. C. DOWD ET AL.

(Filed 24 May, 1911.)

1. Deeds and Conveyances — Registration — Common Law — Sister
   States—Statutes—Presumptions—Proof.

   At common law, registration of a conditional sale or a sale
   on commission was unnecessary, and while registration is re-
   quired for certain purposes under our statute of a conditional
   sale, it does not apply when the *situs* of the contract is in

another State, and if there is no evidence that the law of that State requires registering, the contract is valid without it, for the common law is presumed to prevail there unless the contrary is shown, and our courts will not take judicial notice of a statute of a sister State.

2. Same—Bankruptcy—Trustee—Title.

When the *situs* of a conditional sale is in another State and there is no proof of the common law as recognized there, or of a statute requiring registration of such a contract of sale, the presumption is that registration is not necessary to the validity thereof.

3. Vendor and Vendee — Conditional Sales — Bankruptcy—Notes— Endorsers and Sureties—Proof of Claim—Dividends—Presumptions.

Sureties and endorsers on notes given by a debtor for the purchase price of goods, the title to which has been retained by the creditor as further security, are discharged from liability when the creditor proves his debt as an unsecured claim against the principal debtor, who has become insolvent and a bankrupt and receives a dividend from the bankrupt court upon his claim, after permitting the trustee to take the goods for the benefit of the general crditors, as in such a case he is regarded as having intentionally abandoned the property to the trustee in bankruptcy and as ratifying his acts.

4. Same—Discharge of Sureties, Etc.

When a creditor holds a note with collateral for his debt, and also with accommodation endorsers or sureties thereon, he discharges the endorsers or sureties either in full or *pro tanto,* as the case may be, by voluntarily and irrevocably parting with the collaterals.

5. Notes — Endorsers and Sureties — Subrogation — Collaterals Released by Creditor—Discharge.

An endorser paying a note is entitled in equity to an assignment of the collaterals held by the creditor, to secure the same; and if the creditor has voluntarily rendered himself unable to assign the collaterals, or has caused them to become unavailing to the endorser, the latter is discharged, *pro tanto,* and if only a part of them has been thus lost to the endorser he is discharged.

6. Same—Conditional Sales—Interpretation—Accommodation Paper —Renewals.

The plaintiff, under a contract made in another State, shipped to its agent in Alabama a lot of vehicles, and received notes

therefor from the agent, under a stipulation in the contract that they should be considered as accommodation paper only, and that the title should not pass to the agent by reason thereof, nor should the notes change the fiduciary relation created by the contract, and that the vehicles, until sold by the agent, should remain the property of the plaintiff, with full control thereof, and the proceeds of any sale to the amount of the invoice price should be paid to the plaintiff. Renewals of the notes were provided for by the contract, and while as to the originals and all renewals except the last, it was clearly and expressly stated that they were given only for the accommodation of the payee, there was some doubt from the language used as to whether the last renewals were, as they were "to be paid at maturity without reference to the amount of work still on hand unsold" at that time. *Held* (by a making of the Court), that the renewal notes under the terms of the contract retained the character of the originals as accommodation paper, it being incumbent upon plaintiff, by whom the contract was written, to have expressed itself without ambiguity with reference thereto, and the language being construed most strongly against him. *Held, further*, by the Court, whether the notes were accommodation paper or not, the plaintiff released the defendant as endorsers on the notes by proving them in the bankruptcy proceedings against the maker thereof, and voluntarily relinquishing the vehicles to the trustee in bankruptcy for the benefit of all the creditors, and by receiving a dividend on its claim filed in the proceedings from the general assets without asserting any right to or lien upon the property formerly held by its agent.

7. Notes — Endorsers and Sureties—Collaterals Relinquished—New Promise—Discharge of Endorser's Liability.

Endorsers or sureties on a note for which the payee holds other security do not lose their right of subrogation to the security thus held, by having promised, even for a consideration, but before the notes were executed, to pay them at maturity, and a voluntary relinquishment of the security by the creditor, such acts of his as render the collateral unavailable to the endorsers, releases them, at least to the extent of their loss.

APPEAL from *E. B. Jones, J.*, at the May Term, 1910, of MECKLENBURG.

The plaintiff appointed James G. Dowd as their agent at Birmingham, Ala., for the sale of their vehicles, under a contract dated 14 January, 1907 (Exhibit A), by which it was provided that the agent should pay all freight and storage charges

and taxes, insure the property in the name and for the benefit of the plaintiff, and sell the vehicles, in the usual course of business, to *bona fide* customers, for cash, at not less than the consigned invoice value of the same. It further provides as follows:

"(5) Said agent shall sign and send to the Brown Carriage Company accommodation notes for the amount of each invoice as soon as it is sent to him, said notes being dated the same day as the invoice and to be payable one-third in four months, one-third in five months, one-third in six months, said notes being considered as accommodation notes only, and no title in said vehicles pass to said agent by reason of giving same, nor does the fiduciary relation established by this contract change on that account.

"(6) On the first of each month, following the date of shipment, said agent is to make a full and complete report of all sales made, at the same time remitting to the Brown Carriage Company proceeds of said sale, retaining as his commission only such amount as shall have been received in excess of the invoice value of said goods.

"(7) Ten days before the first accommodation note referred to in paragraph No. 5 comes due, should the monthly payment for goods sold not have equaled an amount sufficient to pay same, said agent is to mail a new note at four months to said Brown Carriage Company for the difference between the total of said payments and the amount of this note. The Brown Carriage Company is to return to them the accommodation note referred to. Should said monthly payments exceed the amount of the first note falling due, the note is to be returned to said agent by the Brown Carriage Company, and the amount in excess is to be credited as a part payment on the second note falling due, and other payments made from that time to be credited on this second note in the same manner as provided for with the first note. Should these payments not be sufficient to pay the second note ten days before its falling due, said agent is to send a new note at four months for the amount remaining after deducting these remittances, and the Brown Carriage Company is to return the second accommodation note, as provided for the first accommodation note. Should the amount so paid exceed the amount

of the second note, the surplus is to be credited on the third note in the same manner as on the previous notes. Should it not be sufficient to pay the third note, however, a new note is to be given at four months, as provided for with the two preceding notes. When the three renewal notes given as provided for above fall due, they are to be renewed in like manner, the renewal notes falling due twelve months from the time of shipment. These notes are to be paid at maturity, without reference to the amount of work still on hand unsold at that time.

"(8) Said agent shall make a report of goods on hand at any time the Brown Carriage Company shall request same, giving stock number and catalogue number of the vehicles. The attorney or agent of the Brown Carriage Company shall have access to the premises wherein said goods are kept, for the purpose of ascertaining their condition or whatever information they may desire with respect thereto; also the privilege of examining books and records pertaining to the sale of said vehicles.

"(9) If at any time, through the carelessness or neglect of said agent, any of the vehicles on hand be damaged or their condition be such as to impair their value, said agent agrees to pay to said Brown Carriage Company such an amount as will put the vehicles in good condition.

"(10) All the vehicles supplied to said agent by said principal, until in good faith sold by the latter as provided herein, shall remain the absolute property of said principal, who may at will require same to be delivered or reshipped to it or delivered to any agent of said company. All the proceeds of sales received by said agent accruing from sale of goods supplied hereunder shall belong to said principal, excepting only such amount as shall be in excess of invoice value of the same, which excess said agent shall accept as full recompense of his services, charges and expenses of every kind and description.

"(12) It is expressly understood and agreed by and between the parties hereto that this is a special agency contract for the sale of vehicles of the Brown Carriage Company, and that no act or omission on the part of said agent shall in anywise bind the Brown Carriage Company, no further authority being conferred upon said agent.

"(13) If said agent shall fail to comply with any of the conditions of this contract, he shall upon non-compliance forfeit all commissions or remuneration due or which may become due the said agent hereunder."

The agent gave the notes described in clauses 5 and 7 of the contract, and this action was brought to recover the amount of the three renewal notes mentioned in the last part of the seventh clause. The first of these notes, dated 1 February, 1908, is for $500 and due 30 May, 1908; second, dated 25 February, 1908, for $416.36, due 1 July, 1908; third, dated 25 March, 1908, for $416.36, due 1 August, 1908; the total amount of the notes being $1,332.72. All the notes, both original and renewals, were endorsed by the defendants, W. C. Dowd and W. F. Dowd. Plaintiff also alleges that on 4 July, 1908, after the maturity of the note for $500 and the note for $416.36 due 1 July, 1908, the defendants, for a valuable consideration, promised to pay the same. The agent sold vehicles from time to time and accounted to the plaintiffs for the proceeds of sale. On 6 January, 1908, he was adjudicated a bankrupt, and at that time he had in his possession vehicles exceeding in value the total amount of the notes in suit. The defendants answered and averred that the notes upon which this suit was brought were accommodation notes by the terms of the contract of agency and given by James G. Dowd and endorsed by the defendants only for the accommodation and benefit of the plaintiff, who wished to use them in bank to supply a deficiency in their capital, caused by a withdrawal of the money which they had invested in the vehicles shipped to their agent at Birmingham, and therefore they were not liable thereon to the plaintiff. They further alleged that the plaintiff had surrendered the vehicles to the trustee in bankruptcy of James G. Dowd, had proved the claim against him as a general creditor without asserting any lien on or right to the vehicles, and had actually accepted a dividend from the bankrupt's general assets as an unsecured creditor, and that by this conduct the defendants as endorsers, or even as sureties, were released. The plaintiff admits that it proved its claim in bankruptcy without asserting any right to or lien upon the vehicles, which they permitted to be taken by the trustee and applied to

the payment of the bankrupt's debts generally, and also that it received its dividend from the trustee, knowing that he had the property, but it relied on the fact that the defendants, by promising, after the bankruptcy, to pay the notes, induced the plaintiff to desist from taking possession of the goods, and tendered an issue to that effect, which was refused. The court submitted issues to the jury, which, with the answers thereto, are as follows:

"1. Were the originals of the notes sued on executed by James G. Dowd pursuant to the terms of the contract marked Exhibit A? Answer: Yes. 2. Were the originals of the notes sued on, and all renewals thereof, executed by James G. Dowd and endorsed by the defendants for the accommodation of the plaintiff? Answer: Yes. 3. Were the defendants induced to endorse said notes by reason of the representations of the plaintiff that said notes were only to be paid from the proceeds of the sales of the vehicles shipped to said J. G. Dowd by the plaintiff under the terms of the contract marked Exhibit A? Answer: Yes. 4. What amount of the proceeds of the sale of the original shipment of vehicles by the plaintiff to James G. Dowd were paid to the plaintiff by the said James G. Dowd? Answer: $690. 5. What was the invoice price or value of the balance of said original shipment left on hand when James G. Dowd filed his petition in bankruptcy? Answer: $950. 6. What disposition was made of the balance of said first shipment so left on hand when said petition in bankruptcy was filed? Answer: Trustee in bankruptcy. 7. What disposition was made of the other vehicles shipped to James G. Dowd by the plaintiff which were on hand when said petition in bankruptcy was filed? Answer: Trustee in bankruptcy. 8. What was the invoice value of all vehicles shipped by the plaintiff to James G. Dowd which were on hand when said James G. Dowd filed his said petition in bankruptcy? Answer: $1,700. 9. Did the plaintiff file its claim as a general creditor of James G. Dowd with the referee in bankruptcy for the alleged balance claimed to be due it by said James G. Dowd for vehicles shipped to the said James G. Dowd by the said plaintiff? Answer: Yes. Stating partially secured by endorsement of notes sued on. 10. Did the defend-

ants, after the maturity of the notes described in the plaintiff's second cause of action, and after the said notes had been protested for nonpayment, agree to settle same? Answer: No. 11. Did the defendants waive the right to have the funds received from the goods sold by J. G. Dowd applied as payment on the notes? Answer: No."

Judgment was entered upon the verdict for the defendant, and plaintiff appealed.

*Pharr & Bell for plaintiff.*
*Burwell & Cansler and Thaddeus A. Adams for defendant.*

WALKER, J., after stating the case. The vital question in this case arises out of the somewhat vague wording of a clause of the contract between the plaintiff and James G. Dowd, who was appointed agent at Birmingham, Ala., to sell its vehicles. The material parts of the contract are generally expressed with sufficient clearness to be easily understood, but the last clause in the seventh section is given different constructions by the respective parties. The original notes and the successive renewals thereof, except the last, were undoubtedly for the accommodation of the plaintiff, and if the last renewals, being the notes sued on, are of a like character, the plaintiff is not entitled to recover, and the verdict and judgment were right. But what does the language of that one sentence mean? "These notes (the last renewals) are to be paid at maturity without reference to the amount of work still on hand unsold at that time" (that is, at their maturity, which was twelve months from the time the vehicles were shipped). The plaintiff says that this provision changed the character of the notes and they became ordinary promissory notes, endorsed by W. C. Dowd and W. F. Dowd, not for its accommodation, but for the benefit solely of their brother, James G. Dowd, and that they were due and payable at their maturity to the plaintiff by both maker and endorsers, who were really sureties for their payment. The defendants, on the contrary, contend that, as shown by the proof, the object in giving the notes was that plaintiff might use them as a basis of credit in bank and supply the deficiency in funds for carrying on its business, which had been caused by the withdrawal of money

invested in the vehicles held by their agent, James G. Dowd; that they were executed solely for the benefit of the plaintiff, and not to create any liability of the defendants for their ultimate payment; and, further, if it had been intended that the defendants should, in the end, become absolutely bound for their payment, it was no advantage to them that they were originally accommodation paper. The defendants therefore insist that they continued to be accommodation notes, and that the stipulation for their payment at maturity meant a payment by the payee, who is the party legally bound to pay them, and this position is sound, provided the premise is correct that they did not cease to be accommodation notes because of that provision. "An accommodation bill or note is one to which the accommodating party has put his name, without consideration, for the purpose of accommodating some other party who is to use it, and is expected to pay it." 1 Daniel Neg. Inst., 191. They also contend that if this language is obscure, any doubt as to its meaning should be resolved in their favor, and in this connection rely on *Hill v. Mfg. Co.,* 79 Ga., 105, in which *Chief Justice Bleckley* said: "We recognize that the party who wrote the contract, made it ambiguous and executed it in that condition, must explain the ambiguity in order to obtain a construction of it in his favor. The author of the ambiguity has the burden of explaining it when he seeks to take the benefit of a construction favorable to himself, and if he does not clear up the meaning beyond doubt, the doubt must be given against him." They further contend that if not accommodation paper, and the stipulation is to be considered as having changed the character of the notes so that the defendants became liable upon them as endorsers or sureties to the plaintiff, it follows that the terms upon which James G. Dowd held the vehicles were also changed, and the shipment, instead of being a consignment as originally contemplated, was converted into a sale, not absolute, but conditional, the title to vest when the notes are paid, or that the vehicles in the possession of James G. Dowd were thereafter to be held by him as a security for the payment of the notes. If this be so, it is then argued that by relinquishing the property thus held for it as security, whether by way of conditional sale or otherwise, to the

trustee in bankruptcy, to become a part of the general assets of
the bankrupt and by proving its claim as unsecured and receiv-
ing a dividend from the general assets, plaintiff waived its lien
upon the property and discharged the defendants, W. C. Dowd
and W. F. Dowd. It was admitted that all the notes were exe-
cuted pursuant to the terms of the contract. We are inclined to
the opinion, upon a view of the entire transaction, that the notes
retained their original quality of accommodation paper, notwith-
standing the clause of the contract which gave rise to this litiga-
tion, but we need not decide that question, as our opinion is with
the defendants upon their second proposition. We may as well
state now that the contract between the plaintiff and James G.
Dowd was not made in this State, nor was it to be performed
here, and if the stipulation in the contract, as to the payment of
the last renewals at maturity, turned the consignment into a con-
ditional sale, or impressed a lien upon the property, by way of
mortgage or otherwise, as a security for the payment of the
notes, either of which it may be conceded would require for its
validity probate and registration, if the contract had been sub-
ject to our registration law, the contract is nevertheless valid
without registration, as there is no evidence in the record that
registration of such a contract is required to be in writing and
registered in order to be valid against creditors, either by the law
of Ohio or Alabama. The case, therefore, is not affected by what
is said in *Godwin v. Bank,* 145 N. C., 320; *Lance v. Tainter,* 137
N. C., 249. At common law, such contracts were not required
to be registered, and not in this State until required by statute,
and we presume that the common law exists in other jurisdic-
tions until the contrary is shown. We do not take judicial notice
of the statutes of other States, but they must be brought to our
attention by proof. It was said by *Judge Pearson,* in *Hooper v.
Moore,* 50 N. C., 130: "What is the law of another State or of
a foreign country is as much a question of law as what is the law
of our own State. There is this difference, however: the court
is presumed to know judicially the public laws of our State,
while in respect to private laws and the laws of other States and
foreign countries this knowledge is not presumed; it follows that
the existence of the latter must be alleged and proved as facts,

for otherwise the court cannot know or take notice of them. This is familiar learning. 3 Wooddeson Lec., 175." To the same effect are the following cases: *Knight v. Wall,* 19 N. C., 125; *Moore v. Gwynn,* 27 N. C., 187; *State v. Jackson,* 13 N. C., 564; *Hilliard v. Outlaw,* 92 N. C., 266; Minor on Conflict of Laws, p. 531, where it is said that "if the foreign law in issue is the unwritten law of a State not originally subject to the common law, or, in any event, if it is a statute or written law, the presumption (as in the case of the common law) does not apply." In *Hall v. R. R.,* 146 N. C., 345, we said: "It was stated by counsel for the plaintiff that the law of Virginia was similar in its provisions to our statute, but there is nothing in the record to show what the law of that State is. We do not take judicial notice of the statutes of another State. They must be pleaded and proven." *Griffin v. Carter,* 40 N. C., 413; *Brown v. Pratt,* 56 N. C., 202. However, therefore, the fact may be, we must hold, in the absence of proof showing the contrary, that the new contract, if we may so call it, did not require registration, and consequently the vehicles in the hands of James G. Dowd at the time he was adjudged a bankrupt did not pass to the trustee. When the verdict upon the sixth and seventh issues is read and interpreted in the light of the evidence and the charge of the court, it means that the plaintiff intentionally abandoned the property to the trustee, and when taken in connection with the admission that it proved its claim as an unsecured creditor and received a dividend paid by him from the general assets, it further means that the plaintiff, quietly and without a protest, and certainly without any assertion of its right to the property, assented to, if it did not ratify, the act of the trustee in taking and appropriating the property for the benefit of the bankrupt's general creditors.

There is but one question remaining for our consideration, and that requires us to determine the legal effect of the conduct of the plaintiff with reference to the property upon both its and the defendant's rights. In the first place, if the provision of the contract as to the payment of the last renewals at maturity changed the relation of the defendants to the note as accommodation endorsers, did the plaintiff still retain a lien on the prop-

erty for the security of the debt? It is impossible to read the
contract throughout without concluding that it was the clear
intention of the plaintiff to retain control of the vehicles in the
possession of James G. Dowd until their claim was satisfied in
full. Referring to the first series of notes, the contract provided
as follows: "Said notes being considered as accommodation notes
only, and no title in said vehicles to pass to said agent by reason
of giving same, nor does the fiduciary relation established by this
contract change on that account." The stipulation as to the pay-
ment of the final renewals is in the seventh section of the con-
tract, and it is followed by the tenth section, which positively
and emphatically declares that the vehicles, *until sold by James
G. Dowd,* shall remain the property of the plaintiff, with full
control thereof, and the proceeds of any sale to the amount of
the invoice price, shall be paid to it. If the plaintiff intended
to wipe out this provision and part entirely with all its interest
in the property and all control thereof, and to surrender it alto-
gether, as a security, to James G. Dowd, when the last renewals
were executed, why did it not say so in plain and unmistakable
language? If the provision that the notes should be considered
as accommodation paper, and the giving of them should not have
the effect of passing the title of the property to their agent, ex-
tends to the renewals, and is not confined to the original notes,
and a majority of the Court is disposed to think so, though we
do not decide the point, the contract would retain its legal
designation and character as a simple consignment for sale, or
upon a *del credere* commission, and the plaintiff must fail in
this suit, or if the endorsers of the notes are to be regarded as
simple guarantors of the good conduct and fidelity of plaintiff's
agent, James G. Dowd, the same result would follow, unless some
delinquency of the agent had been shown, *i. e.,* that he had sold
vehicles and had not accounted for the proceeds. As tending to
support this view of the case, it may well be suggested, as it was
by the defendant's counsel, that the stipulation for the payment
of the last renewals at maturity could not have been intended to
change the liability of the endorsers, as it requires payment
"without reference to the amount of work on hand and unsold
at that time," and the parties could not have contemplated that

James G. Dowd and his endorsers should pay the notes in full if nearly all the property had been sold and the plaintiff had received the proceeds of the sale, and only an inconsiderable part of the property remained in the hands of the agent. But however this may be, it is evident that the plaintiff did not intend to release the property—to let it go—until the notes had been paid, even if the liability of the endorser was changed by giving the last renewals. This idea pervades the whole contract. If the endorsers had become insolvent, their nominal principal having become a bankrupt, we apprehend the plaintiff would be in court and claiming that it had never parted with its right to the property and seeking to recover it, or at least to charge it with a lien or as security for the payment of the notes, upon the ground that title to the property did not pass from it by the giving of the last renewals and not until the payment of the same. They would have been surprised by the suggestion, and justly so, that they had relinquished *all* of their rights therein, as they did not intend a sale to their agent. If this be the correct view to take of the case, we think the endorsers were discharged by the conduct of the plaintiff with regard to the property. In Brandt on Suretyship and Guaranty (3d Ed.), sec. 480, the doctrine is thus stated: "If the creditor has a surety for the debt, and also has a lien on property of the principal for the security of the same debt, and he relinquishes such lien, or by his act such lien is rendered unavailable for the payment of the debt, the surety is, to the extent of the value of the lien thus lost, discharged from liability. This rule does not depend upon contract between the surety and creditor, but results from equitable principles inherent in the relation of principal and·surety. It is equitable that the property of the principal, pledged for the payment of the debt, should be applied to that purpose, and it is grossly inequitable that in such case the property should be diverted from that purpose, and the debt thrown upon a mere surety. Upon obtaining such a lien the creditor becomes a trustee for all parties concerned, and is bound to apply the property to the purposes of the trust." The creditor, it is true, must have the means of satisfaction in his hands or under his control, either a lien on the property or something equivalent to it and just as effective,

conferred by law or by agreement, or a right with respect to the property, which the law requires him to assert and preserve or enforce for the benefit of the endorser. "The creditor must part with no security for the payment of the debt; but the security must be a mortgage, pledge or lien—some right or interest in the property which the creditor can hold in trust for the surety, and to which the surety, if he pay the debt, can be subrogated; and the right to apply or hold must exist and be absolute." Brandt, sec. 484. The endorser, when he pays the debt, is entitled to an assignment of the securities held by the creditor, and if the latter has voluntarily rendered himself unable to make it, or has caused the securities to become unavailing to the endorser, the latter is discharged, at least *pro tanto*. In this case it appears that there was enough property on hand to pay the notes. A familiar illustration is a release by a creditor of a lien acquired by the levy of an execution upon the property of the principal debtor. "If the creditor recovers a judgment against principal and surety, or against the principal alone, and execution is issued thereon and levied upon real or personal property of the principal subject thereto, and such property is, by act of the creditor, released from the levy and lost as a security, the surety is discharged to the extent that he is injured thereby." Brandt, sec. 489; *Cooper v. Wilcox,* 22 N. C., 90, in which it is said: "Between the creditor and a surety, the former is not bound to active diligence to protect the latter; but if by his act he deprives him of a security, the latter is *pro tanto* discharged; and where, upon an appeal from the County to the Superior Court, the judgment was affirmed, and execution issued against the defendant and the sureties to the appeal bond, and was levied upon property of the principal debtor sufficient to satisfy it, and the plaintiff discharged the levy, he discharges the sureties. The rights of a surety to protection are recognized in all courts, if his character as a surety can be averred; as at law, in cases between the holder and drawer of a bill, if the former release the acceptor he thereby discharges the latter." And, again: "So, in *Law v. East India Co.,* 4 Ves., 829, it was considered as incontestible that where a creditor has a fund of a principal debtor sufficient for the payment of a debt, and gives it back to the

debtor, the surety can never afterwards be called upon. The creditor, by virtue of the seizure in execution, or of the deposit, becomes a trustee of the security so acquired, or of the fund for the benefit of all concerned, and is responsible to any party injured by unfaithfulness in execution of that trust. For it is a rule that if he be not only creditor, but trustee, *then* even his neglect, if it occasion the loss of that to the benefit of which the surety is entitled will *pro tanto* discharge the surety. *Capel v. Butler,* 2 Sim. & Stew., 457 (1 Cond. Eng. Chan. Rep., 543)." P. 91. The principle is clearly defined by *Chief Justice Brickell* in *Knighton v. Curry,* 62 Ala., 404: "The principle upon which the whole doctrine of subrogation, not only as it is applied for the protection of sureties, but as it is applied to compel him who is primarily liable, or the thing which may be primarily liable to bear a burthen, to continue to bear it for the relief of him, or another thing, secondarily liable, does not depend upon contract, but has its foundation in natural justice, and is said by Chancellor Kent to be 'recognized in every cultivated system of jurisprudence.' No doctrine can be more firmly established than that a surety who has paid the debt of the principal is entitled to stand in the place of the creditor, as to all securities for the debt, held or acquired by the creditor, and to have the same benefit from them as the creditor might have had, if the surety had not paid, and the creditor had resorted to them. 1 Story's Eq., sec. 499, *et seq.;* I Lead. Eq. Cases (4 Ed.), 136; 2 *ib.,* 277; Brandt on Suretyship, secs. 260-282. As a necessary consequence of this right of the surety, it is well settled on authority, that if the creditor, without the consent of the surety, parts with or renders unavailable any security of fund, which he has the right to apply in satisfaction of the debt, the surety is exonerated to the extent of the value of such securities. The reason is, that such securities or fund are impressed with a trust for the payment of the debt, and the creditor is bound to apply them, or hold them as a trustee, ready to be applied for the benefit of the surety. *Cheeseborough v. Millard,* 1 Johns Ch. 409; *Hayes v. Ward,* 4 Johns. Ch. 123; Brandt on Suretyship, secs. 370-372. The principle is sometimes expressed in another form: 'That

when a creditor has the means of satisfaction in his own hands, and chooses not to retain it, but suffers it to pass into the hands of the principal, the surety to that extent will be discharged.' " *Cullom v. Emmanuel,* 1 Ala., 29. It would be useless to multiply authorities to support so familiar a doctrine.

The plaintiff contends, though, that it was lulled into security and induced to part with the property by a promise of the endorsers to pay the notes and the court refused an issue intended to present this phase of the matter. We do not see how a promise to pay the notes could impair the right of the endorsers to have the property preserved and applied to their exoneration. If they had actually assumed their principal's obligation or paid the notes, the right of subrogation would arise at once, and it would be, if anything, more the duty of the creditor to protect them when it is known that they must suffer, or when they have actually been subjected to loss. It can make no difference what kind of endorsers the Dowds were, or whether they were guarantors or sureties, for in either of those relations to the notes, they were entitled to the protection of the creditor, and plaintiff should not have slept upon their rights, nor should it have relaxed its energies in their behalf, simply because they promised to pay the debt. As we have said, its obligation to them was increased thereby, for they were in greater jeopardy of loss, and the plaintiff's solicitude for their protection should have been correspondingly increased and quickened. At any rate, plaintiff failed in its duty, and it would be most inequitable for the consequent loss to fall upon the endorsers. This contract was not intended as a sale, either in its inception or development, but as something far different. The plaintiff surely did not propose to let go the property before it had actually received, not merely notes or a promise to pay, but all of its money. This is apparent, if we give its words, for the contract was prepared by plaintiff, their natural meaning, but settling all doubts against it and fairly and reasonably construing it as a harmonious whole, so as to effectuate the real intention and to do justice and right, and square our decision with the principles of equity, we cannot but conclude that the defendants have been released, as endorsers or promisors, by the fault of the plaintiff.

We have not considered the correspondence between the parties, which was introduced to show that defendants were actually regarded as accommodation endorsers, though we think the court erred in admitting secondary evidence as to the contents of the lost letter, the proof as to search and loss not being sufficient to dispense with the primary proof—the letter itself. But this is not material, in the view we have taken of the case, as we think the rights of the parties can be sufficiently determined by the contract itself and the undisputed facts, without the aid of extraneous proof.

Perhaps we should further inquire whether the relinquishment of the property to the trustee is such a dealing with the security by the plaintiff as to discharge the endorsers of the notes, but this would seem to be too plain to need any demonstration. The very question was presented in *Fleming v. Odum,* 59 Ga., 362, and the creditor held to have forfeited his right of recourse to the surety for payment. The Court said: "In respect to this property so levied on, the assignee stood in the shoes of the defendant, and the sheriff had no more right to deliver up the property to the assignee than he would have had to deliver it to the defendant himself; therefore *Lumsden v. Leonard* controls this case. Indeed, this case is stronger for the surety than that. In that case the defendant still had the property, and another levy might have been made, and the only hurt the surety sustained was the danger that defendant, his principal, might have run it off. This risk was increased, because the creditor, through the sheriff, had in hand enough to pay the debt from the principal's property, and let it go; but in this case much more has the surety been hurt; for the property has gone to another—the assignee has it, and probably has disposed of it to pay other debts—at least it has not been heard of since. This creditor has not pursued it, either against the sheriff or the assignee, or claimed the proceeds in the bankrupt court. It is gone—a dead loss to this judgment—and the surety is hurt to the extent of its value, and that is enough to pay the whole judgment. So that the result is that the surety's property is levied on to pay a judgment which the creditor had enough of the principal's property to pay, but, by his fault and the sheriff's—

one or both—let it unlawfully get away from under the levy. We think it clear that the surety is discharged." It is not suggested and cannot successfully be contended, that, if the property was held on consignment at the time of the bankruptcy, it passed to the trustee.

We have reached our conclusion in this matter with less hesitation, because we believe it accords, not only with well settled rules of law, but with the very justice of the case. Had the plaintiff intended to change the character of the notes and convert what was a consignment into an absolute sale, and not a conditional one, nor into a lien or security, it should have expressed that intention clearly and not left it to uncertain, if not unwarranted, inference. If the plaintiff expects the courts to enforce this kind of contract according to its present contention, it should use language which more plainly carries that idea with it, or, at least, should free it of its present ambiguity; otherwise it cannot complain if it is construed favorably to endorsers. Our rendering of its provisions makes it consistent, while that of the plaintiff, we think, produces discord and repugnancy and frustrates its leading purpose. We would not be understood as even intimating that the plaintiff inserted the disputed clause in the contract for a double purpose, and so that, in certain eventualities, it might claim either way that might subserve its interests, though such a suggestion is made in this case and was made in *Bank v. Scott,* 123 N. C., 539, cited by the defendant's counsel, in regard to a contract somewhat similar. It is not necessary that we should search for a bad motive, when the rights of the parties must depend upon the contract as it is written, there being no allegation of fraud. The plaintiff has merely failed to state in the written instrument what it now says was its intention, and that is all. It is not a question of motive, but of construction.

We find no reversible error.

No error.